**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **REGINALD FLEMING, WILLFREDO** | ) | |
| **VASQUEZ, PETER D. CARTER, DARRYL D.** | ) | |
| **MACARTHUR, EDWARD BANEVICIUS,** | ) | |
| **THOMAS BALLUFF, JOHN BAPTISTE,** | ) | |
| **LARRY BORTKO, DALE CHOBAK,** | ) | |
| **THOMAS PSIHOGIOS, and RICKY WHITE,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 03 C 9391** |
| | ) | |
| **UNITED PARCEL SERVICE and** | ) | |
| **INTERNATIONAL  BROTHERHOOD** | ) | |
| **OF TEAMSTERS, LOCAL 705,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

The plaintiffs in this case are "feeder drivers"[1] for United Parcel Service and members of

Local 705 of the International Brotherhood of Teamsters Union.  In 2002, the plaintiffs were

temporarily laid off from their home domicile facilities in UPS's Metro Chicago district, and they

transferred to facilities in the North Illinois and Chicago Area Consolidation Hub districts, where

they "bumped" other workers with less seniority.

The plaintiffs' claims are based on their treatment during and after these temporary

layoffs.   They have sued UPS for breaching its collective bargaining agreement with Local 705

under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and have also sued

---

[1]  Feeder drivers driver semi-tractor trailers for UPS.

1

Local 705 for breaching its duty to fairly represent them under section 9 of the National Labor Relations Act, 29 U.S.C. § 159. In addition, plaintiffs Fleming, Carter, and Vasquez have asserted claims of race discrimination against UPS under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5. Defendants have moved for summary judgment on all of these claims. For the reasons outlined below, the Court grants the defendants' motions.

### Facts

Defendant UPS ships packages throughout the world. In the Chicago metropolitan area, UPS has three districts collectively known as the Tri-District – Metro Chicago, North Illinois, and the Chicago Area Consolidated Hub (CACH). Metro Chicago has three facilities (Jefferson Street, Northbrook, and Franklin Park); North Illinois has two facilities (Addison and Palatine); and CACH, the largest UPS facility in the country, is its own district. Defendant Local 705 is a labor union local that represents over 12,500 UPS employees within UPS's Tri-District. Landem Decl. ¶¶ 4-10. UPS and Local 705 negotiate and enter into collective bargaining agreements that govern the employment relationship between UPS and its employees, and both are involved with various aspects of interpreting and administering the agreements.

During 2002, plaintiffs, who are feeder drivers domiciled[2] at UPS facilities in Metro Chicago, were laid off from their positions in that district due to a shortage in work. Specifically, these plaintiffs are:

- Thomas Balluff, a Caucasian man assigned to UPS's Northbrook facility who was laid off in February 2002. Def. 56.1 Stmt. ¶¶ 8, 43, 68.

---

[2] According to Gary Landem, UPS's Metro Chicago labor manager, a feeder driver's home domicile is the facility into which he is initially hired; that facility generally remains the driver's home domicile for the rest of his career at UPS. Landem Decl. ¶ 15. The parties dispute the circumstances under which a feeder driver can change his home domicile.

- Edward Banevicius, a Caucasian man assigned to UPS's Northbrook facility who was laid off in February 2002. Def. 56.1 Stmt. ¶¶ 7, 42, 68.

- John Baptiste, a Caucasian man assigned to UPS's Northbrook facility who was laid off in February 2002. Def. 56.1 Stmt. ¶¶ 9, 44, 68.

- Larry Bortko, a Caucasian man assigned to UPS's Northbrook facility who was laid off in May 2002. Def. 56.1 Stmt. ¶¶ 10, 45, 70.

- Peter Carter, an African-American man assigned to UPS's Northbrook facility who was laid off in January 2002. Def. 56.1 Stmt. ¶¶ 5, 39, 69.

- Dale Chobak, a Caucasian man assigned to UPS's Franklin Park facility who was laid off in May 2002. Def. 56.1 Stmt. ¶¶ 11, 46, 70.

- Reginald Fleming, an African-American man assigned to UPS's Northbrook facility who was laid off in February 2002. Def. 56.1 Stmt. ¶¶ 3, 38, 68.

- Darryl MacArthur, an African-American man assigned to UPS's Northbrook facility who is unsure when he was laid off. Def. 56.1 Stmt. ¶¶ 6, 41, 69.

- Thomas Psighogis, a Caucasian man assigned to UPS's Northbrook facility who was laid off in November 2002. Def. 56.1 Stmt. ¶¶ 12, 47, 69.

- Willfredo Vasquez, a Hispanic man assigned to UPS's Jefferson Street facility who was laid off in February 2002. Def. 56.1 Stmt. ¶¶ 4, 40, 68.

- Ricky White, an African-American man assigned to UPS's Jefferson Street facility who was laid off in February 2002. Def. 56.1 Stmt. ¶¶ 13, 48, 68

Despite being laid off from their respective jobs, the plaintiffs were able to take positions as feeder drivers in UPS's CACH and North Illinois districts, "bumping" other workers who had less seniority.[3] When the layoff ended in December 2002, the plaintiffs were recalled to their home domicile facilities in the Metro Chicago district. Def. 56.1 Stmt. ¶ 56, 71, 96-97. They

---

[3] The exceptions were plaintiffs Bortko, MacArthur, and Vasquez who were out on either worker's compensation or disability leave at various times during the layoff. Def. 56.1 Stmt. ¶ 71.

were laid off in 2003, 2004, and 2005, however, due to shortages of work. During these periods, plaintiffs bumped into positions in other job classifications in the Metro Chicago district or took voluntary layoffs subject to recall. Def. 56.1 Stmt. ¶ 99.

Plaintiffs' claims arise out of their treatment following the 2002 layoff. They contend that under the collective bargaining agreement then in effect (the "Old CBA"), they were entitled to remain at the facilities to which they had relocated. If they had been allowed to remain at those facilities, they would have avoided the later layoffs. Plaintiffs contend that UPS breached the Old CBA in requiring them to return to Metro Chicago after the 2002 layoff; that Local 705 failed to pursue their grievances regarding UPS's action; and that Local 705 harmed plaintiffs by negotiating away, in the collective bargaining agreement concluded in October 2002 ("New CBA"), their purported right to stay in the facilities to which they had bumped. Plaintiffs Fleming, Carter, and Vasquez further contend that defendants racially discriminated against them by not following the Old CBA as well as by negotiating away their rights in the New CBA.

The parties agree that under the Old CBA, laid off feeder drivers could bump or displace the least senior feeder driver within the Tri-District. Def. 56.1 Stmt. ¶¶ 56-57. The parties disagree, however, about the options laid off feeder drivers had after they displaced that individual.

First, defendants contend that a feeder driver's home domicile facility does not change even if he bumps into another facility during the layoff. Plaintiffs, in contrast, argue that a displaced feeder driver could opt to change his home domicile to the facility into which he bumped after working there for thirty days. Def. 56.1 Stmt. ¶¶ 72-73, 113.

Second, the parties disagree about whether a laid off feeder driver had the right to bid on

shifts and start times at the facility into which he bumped. At each UPS facility, feeder driver start times are put up for bidding twice a year based on center seniority, defined as the date the individual first obtained a feeder position with UPS. Defendants argue that feeder drivers may only bid for shifts and start times within their home domiciles; plaintiffs contend that feeder drivers stationed outside their home domiciles are also allowed to participate in the bidding process. Def. 56.1 Stmt. ¶ 49-52.

Third, the parties dispute whether plaintiffs had a right to remain at the facility to which they had been displaced at the end of the layoff. The Old CBA provided that "[w]hen a layoff is over the employee may return to his/her regular Center." Defendants say this provision simply permitted laid off feeder drivers to return to their home domicile facilities after the end of a layoff. Plaintiffs contend that this provision and company practice gave laid off feeder drivers the right to remain permanently at the facility into which they had bumped after thirty days, to designate that facility their home domicile, and to bump into permanent positions there. Def. 56.1 Stmt. ¶¶ 83-84. Defendants disagree, saying that this provision did not give a laid off feeder driver a unilateral right to remain at the location into which he had bumped: instead, the feeder driver, UPS, and Local 705 could reach a mutual agreement under which he could remain by changing his home domicile and bidding on and obtaining a permanent position.

Plaintiffs filed several grievances about their treatment during the 2002 layoff. In these grievances, they complained about being transferred to multiple facilities during the layoff, not being allowed to bid on shifts and start times, not being allowed to bid for permanent positions at the facilities into which they had bumped, and being forced to return to their home domicile facilities at the end of the layoff. Def. 56.1 Stmt. ¶¶ 121, 124, 130, 133.

Most of these grievances resulted in deadlocks at the UPS/Local 705 Grievance Committee. Rather than taking the grievances to arbitration, Local 705 decided to refer them to the UPS/Local 705 committee that was drafting the New CBA. Plaintiffs contend that referring the grievances to the negotiating committee was not an option under the Old CBA and that plaintiffs' grievances were therefore never really resolved. Def. 56.1 Stmt. ¶¶ 102-133.

Both the Old and New CBAs provide for a multi-step grievance and arbitration procedure for resolving disputes involving "differences between the Employer and the Union as to the application or interpretation of the any of the provisions of this Agreement." Defendants argue that Local 705 has the discretion to decide whether to pursue a grievance through arbitration; plaintiffs argue that all grievances require a final resolution, meaning that if there is a deadlock in the UPS/Local 705 Grievance Committee, the grievance must be sent to binding arbitration. Def. 56.1 Stmt. ¶¶ 102–07.

By the time the 2002 layoff ended, the New CBA was in effect. Local 705's membership ratified the contract on October 1, 2002; it had an effective date of August 1, 2002. The New CBA provided that "[w]hen the layoff is over, the employee will return to his/her regular Center." Def. 56.1 Stmt. ¶ 86. It also brought the bumping rights available to laid off feeder drivers during future layoffs in line with the bumping rights available to all other employees. Whereas the Old CBA allowed only laid off feeder drivers to bump the least senior employee in their classification in the entire Tri-District, the New CBA provides that feeder drivers, like other laid off employees, can only bump the least senior employee in their job classification in their home district. New CBA, Art. 44, § 4.

**Discussion**

Defendants are entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving part[ies] [are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When evaluating a motion for summary judgment, the Court must view the facts in favor of the non-moving parties and draw all reasonable inferences in their favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

1.      **Breach of contract / duty of fair representation claims concerning old CBA**

Plaintiffs have sued UPS for breach of the Old CBA and Local 705 for failure to pursue their grievances under the Old CBA. An individual beneficiary of a collective bargaining agreement may not, without more, sue his employer for breaching the agreement. Rather, he may do so only if he can demonstrate that the union representing him has breached its duty to fairly represent union members. *DelCostello v. Int'l Brotherhood of Teamsters,* 462 U.S. 151, 164-65 (1983). In a "hybrid" case of this type, the claims against the employer and the union are interdependent; if the employee fails to establish either, the suit fails. *Id.*

The Court agrees with Local 705 that the plaintiffs' claims for failure to pursue the grievances are time-barred. The claims are subject to a six month statute of limitations. *Id.* at 171; 29 U.S.C. § 160(b). A claim for breach of the duty of fair representation based on failure to pursue a grievance accrues when the plaintiff discovers or reasonably should discover that no further action will be taken on the grievance. *See, e.g., Chapple v. Nat'l Starch & Chemical Co.,* 178 F.3d 501, 505 (7th Cir. 1999). The inquiry is an objective one; "'the asserted actual knowledge of the plaintiffs is not determinative if they did not act as reasonable persons and, in

effect, closed their eyes to evident and objective facts concerning the accrual of their right to sue.'" *Noble v. Chrysler Motors Corp.,* 32 F.3d 997, 1000 (6th Cir. 1994) (quoting *Chrysler Workers Ass'n v. Chrysler Corp.,* 834 F.2d 573, 579 (6th Cir. 1987)).

The New CBA was ratified on October 1, 2002; Local 705 contends that the provision in the New CBA stating that when a layoff is over, the employee "will return to his/her regular Center" should have told the plaintiffs that their grievances had been resolved against them. The Court does not agree; the New CBA did not, on its face, resolve the question of what was to become of grievances filed under the Old CBA. But other facts known to all the plaintiffs made it clear, or should have made it clear, that their grievances were not being pursued. Specifically, each of the plaintiffs admit that in December 2002 or January 2003, they attended meetings with Gerald Zero, the principal officer of Local 705, and Tom Nightwine, Local 705's contract negotiator and head of the Local's delegation to the UPS grievance panel, at which it is undisputed that Zero and Nightwine stated the plaintiffs would have to remain permanently in the Metro District (their original home domicile). Def. 56.1 Stmt. ¶¶ 149-51. This was sufficient to put the plaintiffs on notice regarding the disposition or non-pursuit of their grievances and to start the six-month limitations period. Because plaintiffs did not make their claim until May 2004, it is time-barred. The fact that plaintiffs may not have received official notification of the termination of their grievances had been resolved is not controlling; "a claim ... can accrue even though the union never officially notifies the plaintiff that it will not do what the plaintiff requested." *Pantoja v. Holland Motor Express,* 965 F.2d 323, 327 (7th Cir. 1992).

As to most of the plaintiffs, there is more. Plaintiffs Bortko and Baptiste filed administrative charges of discrimination against Local 705, in July 2003 and October 2003

8

respectively, complaining in part about Local 705's lack of action on their grievances. *Id.* ¶¶ 145-47. Plaintiffs Fleming, Vasquez and Carter admit that in late 2002 or early 2003, they saw correspondence in which Local 705's legal counsel stated that "[g]rievances regarding layoff rights were resolved in accordance with Article 44, Section 4 of the new contract" – the provision requiring them to return to their original domiciles. *Id.* ¶¶ 138-41; Carter Decl. ¶ 29. Finally, in December 2002, all of the plaintiffs other than MacArthur, White and Fleming went to the National Labor Relations Board with another driver who filed a charge against Local 705 for breaching its duty of fair representation in connection with the negotiation of the new contract; plaintiff Vasquez testified that the group was supporting the other driver's charge "because we weren't getting answers directly from anyone regarding our problems ... and the grievances weren't getting anywhere and they weren't listening." *Id.* ¶ 143. As the Seventh Circuit stated in *Pantoja,* "[p]rolonged inaction is sufficient to give a diligent plaintiff notice that the union had breached its duty of fair representation." *Pantoja,* 965 F.2d at 327. *See also Menges v. Freigh Car Svcs., Inc.,* 223 F. Supp. 2d 988, 993-96 (C.D. Ill. 2002) (union's failure to answer questions and giving member the "run around" put member on notice of claim for breach of duty of fair representation).

Local 705 is entitled to summary judgment on plaintiffs' duty of fair representation claims regarding the old CBA, and for this reason, plaintiffs cannot sustain claims against UPS for breach of the Old CBA.

## 2. Breach of duty of fair representation claims regarding new CBA

Plaintiffs have made an additional claim against Local 705 for breach of its duty of fair representation; they contend the Local committed such a breach in negotiating away some of

9

plaintiffs' bumping rights in the new CBA. These claims are likewise are time-barred. A claim for breach of the duty of fair representation arising based on the negotiation of a collective bargaining agreement accrues when the employee discovered or should have discovered the agreement's existence. *See Zapp v. United Transp. Union,* 879 F.2d 1439, 1441 (7th Cir. 1989). The union membership ratified the New CBA on October 1, 2002; plaintiffs concede that Local 705 mailed out copies of the proposed new contract before that date, along with the ratification ballot. Def. 56.1 Stmt. ¶ 93. Plaintiffs have offered no basis for a later accrual date or for tolling the limitations period. Because their duty of fair representation claims against Local 705 were not filed until May 2004, the claim based on the negotiation of the new CBA is time-barred.

### 3. Race discrimination by UPS against plaintiffs Fleming, Carter, and Vasquez

Plaintiffs Fleming and Carter, who are African-American, and Vasquez, who is Hispanic-American, each claim that UPS unlawfully discriminated against them based on their race in administering the Old CBA and implementing the New CBA. Because plaintiffs offer no direct evidence of discrimination, we analyze their claims under the familiar *McDonnell Douglas* burden-shifting standard. Under this standard, a plaintiff can establish a prima facie case of discrimination by showing that he is a member of a protected class, performed his job satisfactorily, suffered an adverse employment action, and was treated less favorably than a similarly situated individual who was not a member of his minority group. *Greenslade v. Chi. Sun-Times, Inc.*, 112 F.3d 853, 863 (7th Cir.1997).

### a. Discrimination under the Old CBA

Plaintiffs allege that UPS discriminated against them under the Old CBA by failing to lay off Jim Lepper, a Caucasian driver with less seniority than they had, during the initial Metro

Chicago layoffs; by allowing Frank Slowik, another Caucasian feeder driver, to return to his home domicile facility while forcing plaintiffs out; and by allowing Caucasian feeder drivers to bid on more desirable shifts at the facilities to which plaintiffs were displaced.

UPS concedes that plaintiffs are members of a protected class, and by waiting until its reply to argue that they did not suffer adverse employment actions, UPS has forfeited that argument for purposes of its motion for summary judgment. In seeking summary judgment, UPS relied on the argument that the Caucasian individuals cited by plaintiffs are either not similarly situated to plaintiffs or were treated the same as plaintiffs.

UPS agrees that Jim Lepper was not laid off but asserts that this was because he had more seniority than all of the plaintiffs. Neither side, however, cites any accurate references to Lepper in the record; both sides merely make contentions about Lepper in their briefs. *See* Pl. Resp. at 7; UPS Reply at 3. Because plaintiffs offer no evidence regarding Lepper that is based on personal knowledge, there is no basis to consider Lepper as comparable to plaintiffs for purposes of evaluating their claims against UPS. *See Juarez*, 366 F.3d at 484.

UPS agrees that Frank Slowik returned to work as a feeder driver in the North Illinois district at the end of the 2002 layoffs. According to UPS, Slowik was similarly situated to plaintiffs and was treated the same as they were. The Court agrees. Slowik and the plaintiffs were laid off during the 2002 layoffs and bumped into facilities outside their home district. Slowik was treated the same as plaintiffs at the end of the layoffs; he, like plaintiffs, was forced to return to his home domicile facility, though this was a different home facility from those of the plaintiffs. *See* Landem Supp. Decl. ¶ 162. In his own declaration, plaintiff Fleming recognizes that Slowik was domiciled in North Illinois, laid off, and forced to return to North Illinois at the

end of the layoff.  Fleming claims that this action violated his seniority rights based on his understanding of the Old CBA, but even if that is so, it still does not support a contention that Slowik was treated more favorably than Fleming and the other plaintiffs in this case in a manner that supports their claims of race discrimination.  Fleming Decl. ¶ 26.

Finally, plaintiffs claim that Caucasian feeder drivers were able to bid on better shifts.  UPS counters that any Caucasian feeder drivers who were able to bid on shifts at the facilities to which plaintiffs were displaced were dissimilarly situated because, they, unlike plaintiffs, had their home domiciles at these facilities.  UPS also argues that similarly situated Caucasian feeder drivers who were displaced temporarily during the 2002 layoffs – including other plaintiffs in this case – likewise were not permitted to bid on desirable shifts and start times.  Plaintiffs provide no basis upon which a reasonable jury could find that Caucasian feeder drivers who were domiciled at the facilities to which plaintiffs were bumped were situated similarly to plaintiffs, and they provide no evidence that similarly situated Caucasian feeder drivers who were laid off were treated more favorably.

Plaintiffs' response cites declarations by plaintiffs Carter and Vasquez, but the cited paragraphs merely state that they were put at the bottom of the seniority list for bidding on shifts and start times.  The cited paragraphs provide no evidence – firsthand or otherwise – that plaintiffs were treated any differently than Caucasian feeder drivers:  they simply complained that they were treated worse than *all* the feeder drivers who were domiciled at the facilities to which they had been displaced.  Carter Decl. ¶ 6; Vasquez Decl. ¶ 5.  The Court concludes that plaintiffs have not shown the existence of a genuine issue of material fact regarding whether similarly situated Caucasian feeder drivers were allowed to bid on more desirable shifts.

### b. Discrimination under the New CBA

Plaintiffs allege that the New CBA has a disparate impact on minority feeder drivers, who plaintiffs contend are disproportionately domiciled in Metro Chicago and are more vulnerable to layoffs due to consistent work shortages in that district. Plaintiffs state that the New CBA makes them more susceptible to layoffs because it eliminates their purported right to remain in the facilities to which they had been displaced during the 2002 layoffs and their ability to bump throughout the Tri-District in subsequent layoffs.

To maintain a successful disparate impact claim, plaintiffs bear the burden of showing that a particular employment practice causes a disparate impact on the basis of race. Once an adverse impact is shown, the defendant must show that the practice is both related to the job and necessary for the business. If the defendant makes this showing, plaintiffs can nonetheless prevail by showing that an alternative practice exists and that defendant refuses to adopt it. *Allen v. City of Chicago*, 351 F.3d 306, 311 (7th Cir. 2003).

Defendants argue that there is no disparate impact because the Caucasian plaintiffs in this case were treated the same. This argument, however, misses the point: a disparate impact claim can succeed even if non-members of the protected class are adversely impacted by the practice in question, so long as there is a disparate or disproportionate impact on members of the protected class.

Plaintiffs' claims nonetheless fail, because they have not offered evidence from which a jury reasonably could find a racially disparate impact, such as demographic information about the UPS districts, information about the seniority of minorities in each district, and information about the number of layoffs in each district and demographic data about those laid off during the

last few years.  *See Price v. City of Chicago*, 251 F.3d 656, 660 (7th Cir. 2001).  Instead,

plaintiffs' claims are based solely on conjecture about the number of minorities in the Metro

Chicago district as compared to the CACH and North Illinois districts.  These unsubstantiated

statements do not raise a genuine issue of material fact about whether the New CBA has a

disparate impact on racial minorities.

## Conclusion

For the foregoing reasons, the Court grants defendants' motions for summary judgment

[docket nos. 65 & 68].  The Clerk is directed to enter judgment in favor of the defendants.

MATTHEW F. KENNELLY
Date: January 9, 2006                                          United States District Judge